IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. NO. 11-00763 SOM |
| | ) | CIV. NO. 24-00137 SOM/RT |
| Plaintiff, | ) | |
| | ) | ORDER DENYING MOTION FOR CORAM |
| vs. | ) | NOBIS RELIEF |
| | ) | |
| DANIEL AVENDANO-SILVA; and | ) | |
| YESICA VILLANUEAVA-MARTINEZ, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING MOTION FOR CORAM NOBIS RELIEF**

**I.        INTRODUCTION.**

Petitioners Daniel Avendano-Silva and Yesica Villanueva-Martinez present an undeniably sympathetic case for coram nobis relief, but the court is ultimately unpersuaded that it should issue the extraordinary writ they seek.

Petitioners came separately to the United States from Mexico as minors.  Both entered without legal authorization and remain here illegally, having been in the United States for decades.  They have three children born in the United States and strong community ties.  They are facing deportation not only because of their illegal entry but also because they were convicted in 2012 of crimes that the law deems to involve moral turpitude ("CIMTs").

On March 21, 2024, Petitioners moved for coram nobis relief.  Claiming ineffective assistance of counsel, they seek to vacate the 2012 convictions on the ground that they were not

timely advised that the CIMT convictions ensured deportation.  On September 11 and 23, 2024, this court held evidentiary hearings with respect to the coram nobis motion.  As sympathetic as their circumstances are, Petitioners were not credible with respect to many of their contentions.  Applying the facts to established law, the court denies their motion.

**II.      FINDINGS OF FACT.**

1.  If any finding of fact is more properly construed as a conclusion of law, or vice versa, it should be construed as such.

2.  The following individuals testified live before this court:

> a.   Daniel Avendano-Silva;
>
> b.   Yesica Villanueva-Martinez;
>
> c.   Yesica Kailani Avendano-Villanueva; and
>
> d.   Gary Singh, Esq.

3.  The parties agreed that the court may consider as evidence statements made in the declarations submitted in conjunction with the present motion, including the Declaration of Johnny Sinodis, Esq., ECF No. 61-2, even though he did not testify live before the court.  *See* Transcript of Proceeding, ECF No. 94, PageID # 587 (Sept. 11, 2024).  The court also considered Petitioners' Exhibits 1, 5, 6, and 7 and Government Exhibits 10 to 31, which were all received in evidence without objection.

4.   The parties also stipulated to the Government's proffer that it could not locate the original passport applications that Petitioners submitted to the United States Post Office, that it could not locate Petitioners' written admissions, and that it could not locate the evidence pertaining to crimes that Petitioners ended up not being charged with.  Accordingly, no person testified with respect to matters contained in the proffer.

5.   Richard Witt provided interpretation services at the hearings held on September 11 and 23, 2024.  Mr. Witt replaced the original interpreter on September 11, 2024.  The court very much appreciated Mr. Witt's making himself available to provide interpretation services on short notice.

6.   As described in more detail below, the court's observations of Petitioners' live testimony and the substance of that testimony have caused this court to question Petitioners' credibility on many points.  At times their testimony veered into inaccuracy.  This court understands that the hearings it conducted may well have involved language complexities, with Petitioners testifying in Spanish.  In addition, the testimony addressed occurrences covering many years, which may have made precise recollection difficult.  The court is therefore not saying that Petitioners engaged in deliberate attempts to mislead

this court on every point in contention.  In the end, however, their testimony was not always believable.

### Petitioners' Upbringing.

7.  Avendano-Silva was born in Santo Tomas, Oaxaca, Mexico in 1977.  *See* Decl. of Daniel Avendano-Silva, ECF No. 61-3, PageID # 317; *See* Transcript of Proceedings, ECF No. 94, PageID # 570 (Sept. 27, 2024).  He currently lives in Waikoloa, on the Big Island of Hawaii.  *See id.*, PageID #s 563 and 569.  He speaks Mixtec and Spanish fluently, but his English skills are limited.  *See id.*  He testified that, in 2011, he did not speak English fluently.  *See id.*, PageID #s 572, 575.  In fact, his former attorney (Gary Singh) testified that Avendano-Silva's English ability was "almost zero."  Singh Test., ECF No. 95, PageID # 700.  His daughter, Yesica Kailani Avendano-Villanueva, confirmed that Avendano-Silva did not speak English at the time of his criminal proceedings.  *See* Avendano-Villanueva Test., ECF No. 95, PageID # 676 (indicating that neither of her parents spoke English in 2011).  But Avendano-Silva clearly understands some English.  For example, the court noticed that when he was asked if the reason he was in court on September 11, 2024, was because he wanted to remain in the United States, he answered "Si" or "Yes" without waiting for the question to be translated. His wife, Villanueva-Martinez, testified that her husband's

English ability is about the same now as it was in 2011.  *See*
Villanueva-Martinez Test., ECF No. 94, PageID # 645.

8.   Avendano-Silva grew up in Mexico, where his family
was "very poor" and sometimes had no food.  His "parents drank a
lot" and were physically and verbally abusive.  *Id.*, PageID #s
317-18; Avendano-Silva Test., ECF No. 94, PageID # 571.  When
Avendano-Silva was seventeen, one of his brothers suggested he
move to Hawaii to pursue a better life.  He moved because he
could not see a future for himself in Mexico.  *See id.*

9.   Villanueva-Martinez, born in 1983 in Tuxpan,
Nayarit, Mexico, also had a difficult childhood, describing it as
"extremely hard and depressing."  *See* Decl. of Yesica
Villanueva-Martinez, ECF No. 61-4, PageID #s 331-32;
Villanueva-Martinez Test., ECF No. 94, PageID # 627.  Her
earliest memories are of being physically abused by her father.
*See id.*  When she was around four years old, her mother moved to
Minnesota, intending to earn enough money to eventually bring her
children there.  *See id.*  Shortly after her mother moved to the
United States, Villanueva-Martinez's father abandoned her and her
siblings.  Her older sister then raised her.  They were "very
poor."  *See id.*  When Villanueva-Martinez was around eleven or
twelve, her mother had a family member bring her to the United
States, and they ultimately settled in Hawaii.  *See id.*;
Villanueva-Martinez Test., ECF No. 94, PageID # 628.

10.   Villanueva-Martinez's declaration indicates that she did not complete school beyond ninth grade, although she testified that she went to school only up to seventh or eighth grade.  *Compare* Villanueava-Martinez Decl, ECF No. 61-4, PageID # 331 ("I did not complete beyond Ninth Grade.") *with* Villanueva-Martinez Test., ECF No. 94, PageID # 631 ("the highest I got was seven or eight, 7th or 8th grade").  She can speak and understand some English, but she predominantly communicates in Spanish at home, at work, and socially.  *See* Villanueva-Martinez Decl, ECF No. 61-4, PageID # 336; Villanueva-Martinez Test., ECF No. 94, PageID # 646.

11.   Petitioners met in the United States, got married in 2006, and have three children, all of whom are U.S. citizens.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID #s 318-19; Villanueva-Martinez Decl., ECF No. 61-4, PageID #s 332-33; Villanueva-Martinez Test., ECF No. 94, PageID # 628.  Avendano-Silva testified that the children are Kailani Yesica Avendano-Villanueva (26), Daniel Avendano-Villanueva (21), and Leslie Daniela Avendano-Villanueva (16).  *See* ECF No. 94, PageID # 570.  The family has "deep ties" in the community and is active in the Waikoloa Community Church.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 319; Villanueva-Martinez Decl., ECF No. 61-4, PageID # 333.  It is clear to this court that if Petitioners are

forced to leave the United States, the family breakup will be indescribably painful and wrenching.

**Petitioners' Pre-Arrest Conduct.**

12.   In 2009, Petitioners applied for United States passports for their children, thinking the passports would be evidence of the children's United States citizenship if Petitioners were ever deported.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 319; Villanueva-Martinez Decl., ECF No. 61-4, PageID # 333; Avendano-Silva Test., ECF No. 94, PageID # 572. The applications were submitted at a United States Post Office, where a postal employee asked Petitioners for identification. The employee refused to accept their Mexican passports as valid forms of identification.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 319; Avendano-Silva Test., ECF No. 94, PageID # 589. "[A]fraid of admitting that [they] were living in the United States without immigration status," they presented false permanent resident cards to the employee.  Avendano-Silva Decl., ECF No. 61-3, PageID # 319.

13.   Two years later, in 2011, Government agents visited Petitioners at their home to discuss the passport applications.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 320; Villanueva-Martinez Decl., ECF No. 61-4, PageID # 333. Petitioners cooperated, answering questions in their living room. *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 320;

7

Villanueva-Martinez Decl., ECF No. 61-4, PageID # 334.  At the end of the conversation, which was in English, the agents said that they had to arrest one of them.  Avendano-Silva volunteered.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 320; Villanueva-Martinez Decl., ECF No. 61-4, PageID # 334; Avendano-Silva Test., ECF No. 94, PageID # 573; Avendano-Villanueva Test., ECF No. 95, PageID # 676.  The arrest occurred on July 27, 2011.  *See* ECF No. 47 (Avendano-Silva's Presentence Investigation Report), PageID # 188.

### Petitioners Retained Gary Singh as Their Attorney, Who Clearly Knew That They Were Mexican Citizens Not in the United States Legally.

14.  On July 28, 2011, the day after Avendano-Silva was arrested, the Government sought to detain him pending trial because he was a citizen of a foreign country or an unlawfully admitted person.  *See id*, ECF No. 5.  He appeared before a Magistrate Judge and was detained pending a detention hearing.  A Federal Public Defender made a special appearance to represent Avendano-Silva, who was retaining private counsel.  Spanish interpreter Miguel Saibene translated that hearing.  *See* Magistrate No. 11-00814, ECF Nos. 2-3.  While Avendano-Silva testified that he had never met any interpreter named "Miguel," *see* ECF No. 94, PageID # 575, court records establish that Saibene was present (although the court does not fault Avendano-Silva for not recalling the interpreter's name years later).

8

15.  Villanueva-Martinez's sister-in-law, Dayvalene Avendano, told Villanueva-Martinez to find an attorney.  After several internet searches, Villanueva-Martinez decided to contact Gary Singh, Esq.  She called Singh, using Dayvalene Avendano as an interpreter because Dayvalene understood a lot of Spanish, even though she spoke little Spanish.  Singh asked Villanueva-Martinez to send him whatever paperwork she had. After reviewing the paperwork, Singh told Villanueva-Martinez that he could represent both her and her husband.  *See* Villanueva-Martinez Decl., ECF No. 61-4, PageID # 335; Villanueva-Martinez Test., ECF No. 94, PageID #s 629-30.

16.  Singh testified that he was able to represent both Petitioners because, in his opinion, there was no conflict of interest.  Singh explained that both Petitioners were in agreement with respect to what had happened, and both wanted to take responsibility.  *See* Singh Test., ECF No. 95, PageID # 693. Singh said he obtained a written conflict waiver from Petitioners but no longer has a copy of the 2011 waiver, given his understanding that he had to maintain client files for only six years.  *See id.*, PageID #s 688, 736.

17.  Discussing circumstances a little out of chronological order to provide fuller context regarding the conflict waiver, this court notes that, in September 2011, Singh told the court that both Petitioners had waived any conflict.

*See* ECF No. 55, PageID # 237.  Villanueva-Martinez testified, by contrast, that Singh never told her that representing her and her husband might be a conflict of interest, and never asked her to sign a document pertaining to conflicts of interest.  *See* Avendano-Silva Test., ECF No. 94, PageID # 631.  On that point, Villanueva-Martinez is not credible, having stood silent at the hearing at which Singh asserted the existence of a waiver.  Importantly, there was an interpreter at that hearing.  *See* Transcript of Hearing, ECF No. 55, PageID # 236 ("THE COURT: Good Afternoon.  The record will also reflect the presence of Spanish interpreter Luz Vega.").

18.  Singh's standard client intake form asked for the client's name, address, birthday, country of birth, Social Security number, the client's status as a United States citizen or green card holder, email, telephone number, and alien registration number, if any.  According to Singh, the alien registration number allowed him to determine the client's immigration status.  *See* Singh Test., ECF No. 95, PageID # 690.  Singh testified that Petitioners' claim that he never asked them about their immigration status makes no sense, especially in light of the nature of the case.  *Compare* Singh Test., ECF No. 95, PageID # 691 ("This entire case deals with immigration.  For anyone to say that I did not ask them about their immigration status makes no sense to me."), *with* Avendano-Silva Decl., ECF

No. 61-3, PageID # 322 ("Mr. Singh never asked me about my immigration status."); Villanueva-Martinez Decl., ECF No. 64-1, PageId # 336 (same); Villanueva-Martinez Test., ECF No. 94, PageID # 654 (indicating that, before she pled guilty, she and Singh had not discussed her immigration status).  Moreover, Villanueva-Martinez admitted that she told Singh that she was not legally in the country.  *See* Villanueva-Martinez Test., ECF No. 94, PageID # 654.

19.  On August 1, 2011, Singh, newly retained, asked for a short continuance of the detention hearing, which was moved to the following day.  On August 2, 2011, Avendano-Silva was ordered detained because his immigration status as an unlawfully admitted person made him a flight risk.  *See id.*, ECF No. 9, PageID # 25.

20.  On August 10, 2011, a Grand Jury charged Petitioners with: falsely stating in applications for three different passports (and aiding and abetting each other) that they had not presented false documents when they had indeed presented fraudulent permanent resident cards as proof of identity in violation of 18 U.S.C. §§ 1542 and 2 (Counts 1, 4, and 7); and falsely claiming to be United States citizens when applying for three different passports in violation of 18 U.S.C. § 911 (Counts 2, 3, 5, 6, 8, and 9).  The Indictment alleged that Petitioners were Mexican citizens.  *See* ECF No. 11.  There is no

question that Singh knew, at the very least, that Petitioners
were not U.S. citizens and were accused of lacking permanent
resident status.

21.  On August 11, 2011, both Petitioners pled not
guilty to the charges in the Indictment.  Spanish interpreter Luz
Vega interpreted for them at the arraignment hearing.
Villanueva-Martinez was released on a $10,000 unsecured bond.
*See* ECF No. 15.  The docket in this case indicates that
Petitioners later surrendered their Mexican passports.  *See* ECF
Nos. 21-22.

### Petitioners Are Not Credible in Contending That They Only Had Interpretation Services for In-Court Proceedings.

22.  Villanueva-Martinez says the first time she met
Singh was at her first hearing.  She says Dayvalene Avendano
translated a short conversation during which Singh told her that
their case was very difficult but that he would do everything he
could to fight for them.  *See* Villanueva-Martinez Decl., ECF No.
61-4, PageID #s 335-36.  Villanueva-Martinez says that, from that
point forward, the conversations she had with Singh were very
short, in English, and at the courthouse.  *Id.*  She says that she
could not understand most of these conversations because they
were in English and there was no professional interpreter aiding
them.  She represents that the only time there was a professional
interpreter was when one was present at a hearing.  *Id.*

12

23.  Avendano-Silva says that it was
Villanueva-Martinez who hired Singh to represent them.  According
to Avendano-Silva, during the duration of the criminal case, he
met with Singh only two or three times outside of court, each
time without an interpreter.  Avendano-Silva says much of what
Singh said was incomprehensible to him because there was no
interpreter.  He says he first met Singh at the prison about a
week after his arrest.  He says Singh told him that Singh was
going to get him out of custody, but never discussed immigration
consequences relating to the criminal charges he was facing, and
never explained the term "crime involving moral turpitude."  *See*
Avendano-Silva Decl., ECF No. 61-3, PageID # 320-21; Avendano-
Silva Test., ECF No. 94, PageID #s 574-76.

24.  Avendano-Silva clearly understands a limited
amount of English.  What concerns the court is how, if there was
no interpreter, he was able to understand statements about
getting out of jail and to know that immigration consequences and
crimes involving moral turpitude were allegedly not discussed.
Singh testified that, to communicate with Avendano-Silva, he had
to use a Spanish interpreter because Avendano-Silva spoke almost
no English.  *See* Singh Test., ECF No. 95, PageID # 700.

25.  Avendano-Silva says that when he saw Singh again
at the prison Singh told him he had to plead guilty, as that was
the fastest way for him to get released from custody. He says

13

Singh did not explain options, and that no interpreter was present.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 321; Avendano-Silva Test., ECF No. 94, PageID # 577.

26.  Avendano-Silva says that September 13, 2011, the day he signed his plea agreement, was the first time he had the assistance of an interpreter.  At that time, Singh told Avendano-Silva through an interpreter that, to reduce the charges and amount of jail time he would have to serve, he had to plead guilty.  Avendano-Silva says Singh told him through the interpreter to tell the court that he understood the terms of the plea agreement when asked.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 322.  Avendano-Silva testified that before then, he had had a discussion with Singh about the plea agreement that was in English with no interpreter present.  That discussion occurred on Singh's second or third visit with Avendano-Silva at the prison.  *See* Avendano-Silva Test., ECF No. 94, PageID #s 577, 594.

27.  According to Singh, he met with Avendano-Silva 10 to 12 times, but the record is not clear on the time span.  That is, Singh might have been including meetings after the criminal case had concluded and immigration proceedings or other related matters were in issue.  What Singh is indeed clear about saying is that an interpreter was present at each meeting.  *See* Singh Test., ECF No. 95, PageID #s 704-05.

14

28.   Singh says he had a separate discussion about the plea agreement with each Petitioner, as Avendano-Silva was detained.   Singh says that Spanish interpreter Miguel Saibene translated these discussions.   Singh says that he has recently been informed that Saibene has passed away, *id.;* Saibene's death certificate is in evidence as Exhibit 26.   *See* ECF No. 94, PageID # 586 (receiving into evidence Exhibits 10 through 31).

29.   Singh remembered having a phone conversation with the interpreter and Villanueva-Martinez during which they went over her plea agreement.   Singh testified, "She had a copy of it, going through it to see if there were any questions."   He said his similar "walk-through" with Avendano-Silva occurred at the Federal Detention Center, with Miguel Saibene as an interpreter. *See* Singh Test., ECF No. 95, PageID #s 705-06.   Singh does not have billing statements for Saibene's work, as he no longer has his client files.   *See* Singh Test., ECF No. 95, PageID #s 688, 708.

30.   At their change of plea hearings on September 13, 2011, both Petitioners told the court under oath that they had signed the plea agreements, that they had had the opportunity to read and discuss the plea agreements with their lawyer before signing them, that the plea agreements had been translated and explained to them in Spanish, and that they understood the plea agreements.   *See* ECF No. 55, PageID #s 244-45.   Villanueva-

15

Martinez now claims that she was not truthful when she told the judge that the plea agreement had been translated for her.  *See* Villanueva-Martinez Test., ECF No. 94, PageID # 659.

31.  Petitioners are arguing that they previously lied to the court when asked whether the plea agreements had been translated and explained to them, but that they are now telling the truth in claiming that they did not understand the plea agreements and that the plea agreements were never explained to them in Spanish.  This court declines to accept this proposition. Petitioners are not credible in saying that Singh never used a translator in out-of-court conversations with them.  Petitioners' limited English abilities would have been obvious to Singh; Petitioners are admitting to having lied to the court.  During the guilty plea colloquy, nothing prevented them from telling the court, through the interpreter, Luz Vega, that the plea agreements had not been translated.  Nor do they offer any reason that Singh would have avoided translation.  Singh was charging Petitioners and presumably passing on translation costs.  Singh had no motive to proceed without an interpreter.  Moreover, even assuming Singh told Petitioners to assure the court they understood the terms of the plea agreement, there would have been nothing wrong with that advice from Singh if there had been prior discussions with the aid of an interpreter.  In that event, Singh would only have been telling his clients what to expect at the

16

change of plea hearing.  In short, numerous factors cause this court to disbelieve Petitioners' assertion that the plea agreements were not translated ahead of the change-of-plea hearing.

### Petitioners Are Not Credible in Saying That They Would Not Have Pled Guilty Had They Known of the Immigration Consequences of Their Pleas.

32.  Avendano-Silva says that, had he known how pleading guilty would affect his immigration status, he would have asked Singh to negotiate a different plea agreement and would have rejected any plea agreement offer that would have made him deportable, inadmissible, and ineligible to defend against deportation.  *See* Avendano-Silva Test., ECF No. 94, PageID # 585. Villanueva-Martinez similarly says that, had she known the immigration consequences of her guilty plea, she would have rejected the plea agreement and insisted on going to trial if an immigration-safe plea agreement could not be obtained.  *See* Villanueva-Martinez Decl., ECF No. 61-4, PageID # 337.  Both Petitioners claim that Singh failed to discuss immigration consequences with them at all.  *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 323 ("Mr. Singh never advised me of the immigration consequences of my charges and he never suggested negotiating for an immigration-safe plea agreement."); Villanueva-Martinez Decl., ECF No. 61-4, PageID # 336 ("Mr. Singh never advised me of the immigration consequences of my charges

and he never suggested negotiating for an immigration-safe plea agreement."); Villanueva-Martinez Test., ECF No. 94, PageID # 642 (stating that, as of October 2022, Singh had never told her that the crimes she pled guilty to would make it impossible to seek cancellation of removal).

> 33.   Singh, on the other hand, says he
>
>> knew, and clearly advised both of them, that they would face removal from the United States . . . .  Either they would be removed because the immigration court would find that their conviction under 18 U.S.C. § 1542 was a crime involving moral turpitude ("CIMT")-- which I told them was virtually certain to be the outcome--or because they made entry to the United States without inspection, had no legal basis for a legal status in the United States (except asylum relief if they qualified) and would be barred from re-entry for 10 years following their removal under Section 212(a)(A)(i)(I) of the INA.  Their main focus before the Federal Court was not to be sent to jail or spend any additional time in jail.

Singh Decl., ECF No. 76-5, PageID # 449.  The plea agreements did not state that Petitioners would certainly be removed from the country.  *See* Decl. of Jonny Sinodis, ECF No. 61-2, PageID # 313-14 (citing the holding in *Padilla v. Kentucky*, 559 U.S. 356 (2010), that criminal defense attorneys have a duty to inform their clients of the impact of a conviction on the client's removability).  Singh, however, says in his declaration that he told them that they "would be removed."

18

34.   Singh said he would have refused pleading Avendano-Silva out "to something which was a hundred percent clear that would trigger some severe immigration consequence." Singh Test., ECF No. 95, PageID # 741.  Singh said he discussed the likelihood of Petitioners' removal before they pled guilty. He noted that, from the very beginning, Petitioners' main concerns were staying out of jail and remaining in the United States as long as possible.  *See id.*, PageID # 753.  In the plea agreements, the Government agreed to drop the charges pertaining to Petitioners' false claims of United States citizenship, which Singh thought were more clearly CIMTs.  *Id.*

35.   Singh says that both Petitioners hoped to stay in the United States until their eldest daughter graduated from high school.  *See* Singh Decl., ECF No. 76-5, PageID # 451; *See also*, Singh Test., ECF No. 95, PageID # 692 (testifying that Petitioners' main goal was to get Avendano-Silva out of jail), and  753 ("Their main concern was keeping out of jail and . . . staying in the U.S. as long as possible.").  Singh testified that Avendano-Silva was "taking the lead in the case, and [Villanueva-Martinez's] position was, [w]hatever my husband wants, I'm going to go along."  *Id.*, PageID # 693; *see also id.*, PageID # 705 ("her position was, I will do whatever my husband wants me to do").  To facilitate Avendano-Silva's release from custody, Petitioners told Singh that they wanted to change their pleas

19

quickly in the hope that Avendano-Silva would be sentenced to time served. Singh says they told him they were willing to move back to Mexico. *See* Singh Test., ECF No. 95, PageID # 28. While Petitioners' oldest daughter did not hear her parents discuss returning to Mexico, that does not mean they did not have such a discussion with others. *See* Avendano-Villanueva Test., ECF No. 94, PageID # 676.

36. Petitioners' unqualified assertion that Singh never discussed immigration consequences with them is not credible. The very nature of the charges against them makes it unlikely that Singh said nothing at all on that subject.

37. Petitioners' lack of credibility is highlighted by their plea agreements, which provide, "Pleading guilty to criminal offenses may also have adverse consequences with respect to the Defendant's immigration status and/or eligibility to remain in the United States if [he/she] is not a citizen of the United States." The plea agreements then state, "Under Federal law, crimes involving . . . moral turpitude are deportable offenses; and the Defendant's plea to any such crime may subject [him/her] to automatic deportation and removal from the United States." Avendano-Silva Plea Agreement, ECF No. 29, PageID #s 73-74; Villanueva-Martinez Plea Agreement, ECF No. 32, PageID # 92.

38.   Singh says that, in describing immigration consequences to Petitioners, he was "more firm" than the plea agreements, in which the word "may" was used.   Singh says he told Petitioners that he could not think of any relief they could get from the immigration court, and he "made it clear, it's a matter of time when you guys are going to get deported."   Singh Test., ECF No. 95, PageID # 703.

39.   Avendano-Silva claims that he did not read his plea agreement and that no interpreter was present when he and Singh discussed the plea agreement.   *See* ECF No. 94, PageID #s 593-94, 597.   Villanueva-Martinez claims that Singh simply told her in English without the assistance of an interpreter that she had to plead guilty.   She says that he did not show her a written plea agreement before she signed it and that no interpreter read the document to her in Spanish.   *See* ECF No. 94, PageID #s 633-34.

40.   As noted earlier, Singh recalls that he engaged Saibene to interpret in communicating with Petitioners.   *Id.*, PageID # 450.   Singh is certain that he explained to both Petitioners that "the proposed agreement offered by the government would almost certainly result in their removal."   *Id.*, PageID # 451.

41.   Each Petitioner signed a plea agreement, ECF Nos. 29 and 32, agreeing to plead guilty with respect to three counts

of passport fraud, including aiding and abetting each other, in violation of 18 U.S.C. §§ 1542 and 2 (one count for each child for which they presented fraudulent permanent resident cards as their identification) and to one count of possessing a fraudulent permanent resident card in violation of 18 U.S.C. § 1546(a) (which was charged in a separate Information filed in Criminal Nos. 11-00876 SOM and 11-00877 SOM on September 9, 2011).

        42.   On September 13, 2011, pursuant to the plea agreements, Petitioners pled guilty before a Magistrate Judge to the passport fraud charges in Counts 1, 4, and 7 of the Indictment and to the possession of a fraudulent resident card charge in their respective Informations.  *See* ECF Nos. 26-27. With the aid of Spanish interpreter Luz Vega, *see* Transcript of Proceedings, ECF No. 55, PageID #s 236-37, both Petitioners indicated that they had discussed the written charges against them and all of the facts with Singh, and that they were satisfied with his legal representation.  *See id.*, PageID # 242. Both understood that their convictions "might affect" their right to remain in the United States because they were not United States citizens.  *See id.*, PageID #s 251-52.  Indeed, the Magistrate Judge asked, "Since you are not United States citizens, a conviction in this case might affect your right to remain in this country.  Do you understand that, Mr. Avendano-Silva?"  He answered, "Yes."  The Magistrate Judge then asked

22

Villanueva-Martinez the same question.  She also answered, "Yes."
*See* ECF No. 55, PageID #s 250-51.  Given those statements in
court, they lack credibility with respect to many of their
assertions.  Villanueva-Martinez's testimony during coram nobis
proceedings that she had been untruthful when she told the
Magistrate Judge at her change of plea hearing that the plea
agreement had been interpreted into Spanish suggests a
willingness to make statements she believes could help her, even
if inaccurate.  *See* Villanueva-Martinez Test., ECF No. 94, PageID
# 642.

43.  The court holds Petitioners to their earlier in-
court statements that they understood what the plea agreements
contained and that the plea agreements had been translated for
them.

44.  On September 30, 2011, this judge accepted the
guilty pleas and adjudged Petitioners guilty of those offenses.
*See* ECF Nos. 34-35.  Given Avendano-Silva's and Villanueva-
Martinez's statements to the Magistrate Judge that their plea
agreements had been explained to them in Spanish, they are not
credible in asserting that immigration consequences were never
discussed by Singh.  Possibly, they do not remember that
explanation, or the discussion was insufficient in allegedly
failing to indicate the inescapability of deportation.  But in
overstating, Petitioners lose credibility.

**Petitioners Were Not Offered and Were Unlikely
to be Offered "Immigration-Safe" Plea Agreements.**

45. Singh says that in cases like this one, with "overwhelming" evidence against Avendano-Silva and Villanueva-Martinez, his usual practice was to approach the Assistant Unites States Attorney ("AUSA") to discuss plea options. Because the criminal case took place between 2011 and 2012, Singh does not have his client files, which might have included communications and notes of meetings. *See* Test. of Gary Singh, ECF No. 95, PageID # 688. But Singh says he is certain that he would have tried to obtain "immigration safe" pleas if possible. However, having had decades of experience, Singh says he knew that the AUSA, Tracy Hino, "was not inclined to offer such alternatives to Petitioners living in the U.S. illegally under any circumstances." *Id.*, PageID # 448. Singh testified that he had not heard of the U.S. Attorney's Office offering immigration-safe plea agreements. *See* Singh Test., ECF No. 95, PageID #s 696-97. Petitioners introduced no evidence that immigration-safe plea agreements had been offered to any defendant in any other criminal case involving a similar situation in this district during the relevant time period. No statement or testimony by Hino was offered by any party.

24

**Sentencing and Subsequent Immigration Proceedings.**

46.   In connection with her sentencing, Villanueva-Martinez submitted an allocution letter, which the court took into account in sentencing her.  *See* ECF No. 41-1, PageID # 130. That letter stated, "[T]he reason why we applied for the passports is [be]cause we wanted to move to Mexico so we wouldn't have to hide and my kids wouldn't have to see their dad and mom get taken away by the police or immigration."  *Id.*  At the hearing on the present motion, Villanueva-Martinez said that Dayvalene Avendano wrote the letter signed by Villanueva-Martinez.  *See* Villanueva-Martinez Test., ECF No. 94, PageID #s 635-36.  Villanueva-Martinez testified that the sentence in the letter about moving back to Mexico was "a big mistake" and that she signed the letter without reading it.  *See id.*, PageID # 650. Although the letter is addressed to "your Honor," she testified that she could not clearly recall who the letter was supposed to go to.  At one point, she testified that it was supposed to go to an immigration judge.  However, she was only involved with the criminal proceedings in this court at the time the letter was submitted.  Immigration proceedings had not yet begun.  Even viewing the letter in the light most favorable to Petitioners, the court finds that it damages Villanueva-Martinez's credibility.  If indeed she signed a letter without knowing of and agreeing with its contents, that gives this court pause about

25

the reliability of the declaration she signed and submitted in support of the present motion.

47.   On January 12, 2012, the court sentenced Avendano-Silva to time served, 3 years of supervised release, and a $400 special assessment.  Villanueva-Martinez was sentenced to 3 years of probation and a $400 special assessment.  *See* ECF Nos. 42-44.  At the sentencing hearing, this judge told Petitioners that they had to cooperate with the United States Department of Homeland Security, including participating in any removal hearing.  *See* ECF No. 54, PageID # 227.

48.   In January 2012, immigration authorities served Petitioners with notices to appear, beginning removal proceedings with respect to the allegation that they were present in the United States without admission or parole.  *See* ECF No. 76-1, PageID # 429.  Singh testified that the immigration proceedings had been anticipated and that Petitioners' goal was to delay removal so they could see their oldest daughter graduate from high school.  *See* Singh Test., ECF No. 95, PageID # 711.  Singh says he explained to Petitioners that they did not have a great chance of being allowed to remain in the United States.  *See id.*, PageID # 712.

49.   An interpreter was present at all immigration court hearings and translated the proceedings into Spanish for Petitioners.  *See* ECF No. 94, PageID # 662.

26

50.   At a hearing on October 15, 2012, the Immigration Judge informed Petitioners that there was a "big change" in their cases because Homeland Security had added another charge.  *See* Transcript of Hearing (Oct. 15, 2012), Ex. 23 at Bates Stamp 000071.  This "big change" referred to additional charges levied in the removal proceedings, asserting that Petitioners were removable because they had been convicted of CIMTs (the passport fraud and possession of fraudulent resident cards charges to which they had pled guilty).  *See* ECF No. 76-1, PageID # 429. The Immigration Judge continued the hearing until November 5, 2012, to allow Petitioners to analyze whether they were eligible for cancellation of removal.  *See* Transcript of Hearing (Oct. 15, 2012), Ex. 23 at Bates Stamp 000074.

51.   At the November 5, 2012, hearing, Petitioners contested any removability that was based on a CIMT conviction. *See* Transcript of Hearing (Nov. 5, 2012), Ex. 23 at Bates Stamp 000082-83.  Singh argued at that hearing that the convictions lacked the fraudulent intent necessary to establish a CIMT, noting that Petitioners had presented false identifications only to obtain a benefit that their children were entitled to.  *See id.* at Bates Stamp 000089-90; Singh Test., ECF No. 95, PageID # 720 (arguing that Petitioners did not benefit from using false identification).  The Government, on the other hand, argued that the convictions were CIMTs because Petitioners were trying to get

27

passports using false information.  *See* Transcript of Hearing
(Nov. 5, 2012), Ex. 23 at Bates Stamp 000095.

52.   The Immigration Judge allowed the parties to file
written briefs, explaining to Petitioners, "So just to make sure
you understand, the lawyers are going to write legal arguments.
I will decide if the convictions bar you from the application" to
cancel removal proceedings.  *Id.* at Bates Stamp 000103.  Clearly,
by November 2012, Petitioners had been told that there was an
issue regarding whether they had been convicted of crimes barring
them from seeking relief from removal proceedings.  Even assuming
that Petitioners are correct in saying that they received certain
immigration documents but did not know what the documents said,
*see, e.g.,* Avendano-Silva Test., ECF No. 94, PageID # 607, they
would have had an interpreter explaining what was happening
during the immigration proceedings.

53.   In December 2012, the Government made an oral
motion to "pretermit" Petitioners' applications to cancel the
removal proceedings.[1]  Petitioners conceded removability based on
the initial charges that they were present in the United States
without admission or parole, and the Immigration Judge so found
based on clear and convincing evidence.  However, Petitioners

---

[1] A motion to "pretermit" seeks a determination that an
"applicant has failed to establish statutory eligibility for
relief."  *See Guamanrrigra v. Holder*, 670 F.3d 404, 408 n.10 (2d
Cir. 2012) (citing 8 C.F.R. § 240.21).

sought cancellation of the removal proceedings, arguing that cancellation was permissible for illegal presence and that, with respect to the additional charges, removability should not be based on any CIMT because their convictions did not involve CIMTs.

54. Singh testified that he thought it was "unclear" whether he would be successful in arguing to the Immigration Judge in 2012 that the § 1542 passport fraud convictions were not CIMTs. *See* ECF No. 95, PageID # 722. Singh admitted that he was not aware of the 1958 Ninth Circuit case, *Bisaillon v. Hogan*, 257 F.2d 435 (9th Cir. 1958), which Petitioners' coram nobis counsel represented to Singh at the coram nobis hearing held passport fraud in violation of § 1542 is a CIMT. *See* ECF No. 95, PageID # 742. However, Petitioners have not established that the law in the Ninth Circuit at the time was so inarguably established that Singh could not have had a good faith belief that, given the facts of this case, the § 1542 convictions might not qualify as CIMTS.

55. Singh's belief that it "was unclear" whether § 1542 convictions qualified as CIMTs led him to assert that Petitioners' convictions were not CIMTs under the narrow facts presented. He argued for a "nuanced" approach, pointing out that Petitioners presented false alien registration cards to the postal worker only to prove that they were the parents of the

29

children applying for the passports.  In other words, Singh
argued that Petitioners had had no evil motive and did not
benefit from the presentation of false alien registration cards.
*See* Ex. 23G (Immigration Judge Order dated Dec. 11, 2012,
explaining Petitioners' argument with respect to whether their
§ 1542 convictions qualified as CIMTs).  A Ninth Circuit motions
panel later determined that the argument was "sufficiently
substantial to warrant further consideration by a merits panel."
*See* Ex. 24 (Order dated May 17, 2016, in No. 15-70856).[2]  In any
event, Singh says he told Petitioners that they were "virtually
certain" to be deported.  On this point, the court has no reason
to doubt Singh's assertion.[3]

56.  In a written order dated December 11, 2012, the
Immigration Judge determined that the convictions for passport
fraud in violation of 18 U.S.C. § 1542 involved CIMTs that made
Petitioners ineligible for cancellation of removal.  The
Immigration Judge found it unnecessary to determine whether their

---

[2] As discussed later in this order, while the Ninth
Circuit merits panel ultimately concluded that Petitioners'
§ 1542 convictions did qualify as CIMTs, it did so only after
saying that *Bisaillon* predated the categorical and modified
categorical approaches set out in *Taylor v. United States*, 495
U.S. 575, 599-602 (1990).  The Ninth Circuit applied the
categorical approach in confirming that fraud crimes are indeed
categorical crimes involving moral turpitude.  *Id.*

[3] Singh said that, at the time Petitioners pled guilty,
he similarly thought the law was not clear with respect to
whether the § 1542 passport fraud convictions were CIMTs under
the circumstances of this case.  *See* ECF No. 95, PageID # 740.

convictions for possession of fraudulent resident cards were also CIMTs that made Petitioners ineligible for cancellation of removal. *See* ECF No. 76-1, PageID # 431. The Immigration Judge concluded that Petitioners were subject to removal, and, on January 8, 2013, ordered them removed. The order was based both on Petitioners' presence in the United States without admission or parole and on their CIMT convictions. *See* ECF No. 76-1, PageID #s 430-32 (Decision and Order dated Dec. 11, 2012); ECF No. 76-2; *see also* Singh Test., ECF No. 95, PageID # 726.

57. The December 2012 written order does not appear to have been read out loud to Petitioners during any hearing. However, at a hearing on January 8, 2013, which was interpreted into Spanish for Petitioners, both of whom were present, the Immigration Judge did tell Avendano-Silva:

> I already ruled that I didn't believe that you and your wife are eligible for cancellation of removal because of the conviction, and your lawyer tells me that you both waived voluntary departure. And I don't believe you're eligible for that anyway. So that leaves me just with completing the case, and I don't see anything you're eligible for except removal to Mexico.

Ex. 23, Bates Stamp No. 00125. The Immigration Judge then stated, "So I'm going to have to enter orders of removal to Mexico." *Id.*, Bates Stamp No. 00126. Avendano-Silva testified that he knew at this time that the Immigration Judge had ruled

against him and that he would be removed to Mexico.  *See*
Avendano-Silva Test., ECF No. 94, PageID # 614.

58.   Petitioners cannot credibly claim that it was not
until January 2023 that they learned through their coram nobis
counsel that their convictions made them ineligible for
cancellation of removal.  *See* Villanueva-Martinez Decl., ECF No.
61-4, PageID # 341; Avendano-Silva Decl., ECF No. 61-3, PageID #
327-28 (saying that, on January 27, 2023, they consulted with
Marc Van Der Hout and Johnny Sinodis, immigration attorneys, who
told them that their § 1592 convictions were CIMTs that made them
ineligible for cancellation of removal); Sinodis Decl., ECF No.
61-2, PageID # 307.  Petitioners were told by, at the latest, the
January 2013 hearing before the Immigration Judge that their
convictions made them ineligible to cancel removal proceedings.
Even if the details of CIMTs were hazy to them, what should have
been clear was that the Immigration Judge saw no option other
than removal to Mexico.

59.   Singh says he tried to explain the Immigration
Judge's ruling to Petitioners in basic English.  He says he did
not talk to them specifically about CIMTs at that time, because
"nobody really understands that."  Singh Test., ECF No. 95,
PageID # 723.  Singh says they were not surprised because they
knew that they were going to be deported.  *Id.*, PageID # 55.

60.  Petitioners appealed the Immigration Judge's decision and order to the Board of Immigration Appeals ("BIA"), which dismissed their appeals.  In a written order dated February 25, 2015, the BIA also ruled that the convictions for passport fraud in violation of 18 U.S.C. § 1542 involved CIMTs that made them inadmissible and therefore ineligible for cancellation of removal.  *See* ECF No. 76-3.

61.  Petitioners had Singh seek review by the Ninth Circuit of the BIA's dismissal of their appeal.  The Government moved for summary disposition of the appeal to the Ninth Circuit, but, as noted earlier, a motions panel determined that the appeal presented questions "sufficiently substantial to warrant further consideration by a merits panel."  *See* Ex. 24 (May 17, 2016, Order in No. 15-70856).

62.  On June 17, 2019, a Ninth Circuit merits panel denied Petitioners' request in a memorandum decision.  *See* ECF No. 76-4.  The Ninth Circuit noted that, as far back as 1958 the court had ruled that making a false statement in a passport application is a CIMT.  It noted, however, that the 1958 decision predated *Taylor v. United States*, 495 U.S. 575, (1990), which set forth the procedure for determining whether a crime was a CIMT. Applying the Supreme Court's 1990 procedure, the Ninth Circuit determined that the convictions under 18 U.S.C. § 1542 involved matters that still qualified as CIMTs.  The Ninth Circuit then

33

held that Petitioners were therefore barred from seeking cancellation of removal. *See id.*, PageID #s 443-44.

63. Petitioners' oldest daughter, Yesica Avendano-Villanueva, turned 21 the following month, July 2019. *See* ECF No. 61-1, PageID # 300. She says that she helped translate documents and interpret conversations for her parents. *Id.* After the Ninth Circuit decision, she, Petitioners, and Singh met to discuss what they could do to help Petitioners obtain green cards and become lawful permanent residents. *Id.* At that time, Singh suggested that the daughter could join the military or file a Form I-130 visa petition in connection with which Petitioners could depart for Mexico for a consular interview with the hope of returning. *Id.*, PageID #s 300-01; Avendano-Villanueva Test., ECF No. 95, PageID #s 11-12. Singh says, "Although I provided them different options we could *try* to pursue, I was always up front about the likelihood of success, which in their case was quite slim." ECF No. 76-5, PageID # 453. Singh explained that Petitioners "were often unreasonable in their expectations or hopes of what might happen in their immigration proceedings. I tried my best to manage their expectations." *Id.*

64. Singh says that he agrees with Petitioners' coram nobis counsel that they "did not have any viable path to remain in the country in large part because they had been convicted of a CIMT." *Id.*, PageID # 454. With respect to the Form I-130, Singh

34

says he explained to the daughter that, while the petition would
be approved, the second part of the application process "would be
extremely difficult" because the CIMT convictions would bar
Avendano-Silva and Villanueva-Martinez from entry to the United
States for 10 years.  *Id.*  Singh says that he knew they would be
removed and that "[i]t was merely a matter of time."  *Id.*, PageID
# 456.  He says that he "made every good faith effort . . . to
help them stay in the United States as long as possible."  *Id.*

**IV.      CONCLUSIONS OF LAW.**

**Overview of Applicable Immigration Statutes.**

1.    Title 8, Chapter 12, of the United States Code
governs immigration and nationality.  Section 101 of the
Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101,
contains definitions.[4]  For example, it defines an "alien" as
"any person who is not a citizen or national of the United
States."  INA § 101(a)(3), 8 U.S.C. § 1101(a)(3).  "Admission" is
defined as "the lawful entry of the alien into the United States

---

[4] Local Rule 7.5 states that "Citations shall be made
to the applicable United States Code provision(s), rather than
only to the section(s) of a named act or code, although reference
may be made to both.  For example, a citation should not be made
only to section 402(b) of the Clean Water Act; citation shall be
made also or instead to 33 U.S.C. § 1342(b)."  Given this local
rule, the parties have cited United States Code provisions.
However, the immigration authorities in relevant removal
proceedings cited INA sections.  This court has provided both
citations for the convenience of the reader.

after inspection and authorization by an immigration officer."
INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A).

 2. Any "alien" who is in the United States but has
not been "admitted" is deemed an "applicant for admission." INA
§ 235(a)(1), 8 U.S.C. § 1225(a)(1). An individual may be
"inadmissible" on a number of grounds. Relevant here, an "alien"
is "inadmissible" when he or she has been convicted of a CIMT.
INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I).
Additionally relevant here, an "alien" who is present in the
United States without being "admitted" is "inadmissible." INA
§ 212(a)(6)(A)(i), 8 U.S.C.  § 1182(a)(6)(A)(i).

 3. When an "alien" is convicted of a CIMT for which a
sentence of one year of more may be imposed and commits the crime
within 5 years after the date of admission, that alien is
"deportable." INA § 237(a)(2)(A)(i), 8 U.S.C. § 1227(a)(1).
Additionally, when an "alien" is in the United States in
violation of law, that individual is "deportable." INA
§ 237(a)(1), 8 U.S.C. § 1227(a)(1). A "deportable alien" may be
"removed" from the United States. *Id.*

 4. "Removal proceedings" are initiated by providing
an alien with written notice to appear. INA § 239, 8 U.S.C.
§ 1229. "Removal proceedings" are governed by INA § 240, 8
U.S.C. § 1229a. "Cancellation" of an alien's removal may be
sought under INA § 240A, 8 U.S.C. § 1229b. However, removal may

36

not be cancelled unless certain conditions are met, including
that the alien not have been convicted under INA § 212(a)(2), 8
U.S.C. § 1182(a)(2), which includes CIMTs under INA
§ 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I).  *See* INA
§ 239(b)(1)(C), 8 U.S.C. § 1229b(b)(1)(C).

**Overview of Coram Nobis Framework.**

5.    The 1946 amendments to Rule 60(b) of the Federal
Rules of Civil Procedure abolished several common law writs,
including the writ of coram nobis.  *See Doe v. I.N.S.*, 120 F.3d
200, 202 (9th Cir. 1997) (quoting in footnote 2 Rule 60(b) of the
Federal Rules of Civil Procedure) ("Writs of coram nobis, coram
vobis, audita querela, and bills of review and bills in the
nature of a bill of review, are abolished, and the procedure for
obtaining any relief from a judgment shall be by motion as
prescribed in these rules or by an independent action.").  In
*United States v. Morgan*, 346 U.S. 502, 511 (1954), the Supreme
Court held that, despite that abolition, district courts still
retained limited authority to issue common law writs, including
writs of coram nobis in collateral criminal proceedings.  *See
also* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts
established by Act of Congress may issue all writs necessary or
appropriate in aid of their respective jurisdictions and
agreeable to the usages and principles of law.").

6.   "[T]he common law writs survive only to the extent that they fill 'gaps' in the current systems of postconviction relief." *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001).   "[T]he writ of error coram nobis is a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." *United States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007).   The writ is "extraordinary, used only to review errors of the most fundamental character, and filling a very precise gap in federal criminal procedure." *Id.* (quotation marks, citations, and alterations omitted); *see also Carlisle v. United States*, 517 U.S. 416, 429 (1996) ("[I]t is difficult to conceive of a situation in a federal criminal case today where a writ of coram nobis would be necessary or appropriate." (quotation marks, brackets, and citation omitted)).   Errors are of the most fundamental character when they render a proceeding invalid.   *See Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987).

7.   Unlike claims under 28 U.S.C. § 2255, which applies only when a convicted movant is in custody, the writ of coram nobis allows a defendant to attack a conviction when the defendant has completed a sentence and is no longer in custody. *See Matus-Leva v. United States*, 287 F.3d 758, 761 (9th Cir. 2002) (holding that a prisoner who is in custody, including one

who is on supervised release, may seek relief under § 2255, not under the writ of coram nobis); *Estate of McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995); *Hirabayashi*, 828 F.2d at 604). A writ of coram nobis "provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors." *McKinney*, 71 F.3d at 781.

      8. To qualify for coram nobis relief, a defendant must establish all of the following:

> (1) a more usual remedy is not available;
> (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*Matus-Leva*, 287 F.3d at 760; *McKinney*, 71 F.3d at 781-82 (same); *Hirabayashi*, 828 F.2d at 604 (same). "Because these requirements are conjunctive, failure to meet any one of them is fatal." *Matus-Leva*, 287 F.3d at 760. The Government concedes that Petitioners satisfy the first and third prongs of the test for coram nobis relief. *See* ECF No. 76, PageID # 399 n.8. Petitioners have fully served their sentences and are currently subject to serious immigration consequences flowing from their convictions. Accordingly, only the second and fourth prongs are at issue.

**Avendano-Silva and Villanueva-Martinez Fail to Show Valid
Reasons for Not Attacking Their Convictions Earlier.**

9.   Under the coram nobis framework, the burden is on
Petitioners to demonstrate valid reasons for the delay in
attacking their 2012 convictions.  *See Riedl*, 496 F.3d at 1008.
Petitioners do not meet that burden.  "[W]hether petitioners can
*reasonably* raise a claim is determinative of whether delay is
justified.  That is, where petitioners reasonably could have
asserted the basis for their coram nobis petition earlier, they
have no valid justification for delaying pursuit of that claim."
*United States v. Kroytor*, 977 F.3d 957, 961 (9th Cir. 2020).
Thus, the Ninth Circuit has found delay justified when a
defendant discovered new evidence that could not reasonably have
been found earlier, when a defendant delayed taking action
because of misadvice by an attorney that the defendant had no
reason to know was erroneous, and when there has been a change in
the law.  *See id.* at 962.  A lack of clarity in the law is not
usually seen as a valid reason.  *See id.*  In *Kroytor*, the Ninth
Circuit determined that waiting two years after having the facts
available to reasonably know the basis for a coram nobis motion
and ten months after the law was clarified demonstrated an
unjustifiable delay such that coram nobis relief was properly
denied.  *See id.* at 963.

10.   Petitioners claim that Singh did not tell them
about the immigration consequences they faced before they pled

40

guilty, during their removal proceedings, while their appeal
proceeded before the BIA, or in connection with the appeal to the
Ninth Circuit.  Singh says he did indeed tell them about the
immigration consequences at all those times.  As noted above,
Petitioners were not always credible in this court's view, and
that extends to their contention that Singh entirely failed to
tell them about immigration consequences flowing from their
convictions.  But even if this court accepts their contention
that Singh failed to warn them in their criminal case that their
CIMTs would make deportation unavoidable, they were present
during immigration proceedings when the effects of their CIMT
convictions on cancellation of removal were discussed.  Those
discussions occurred when interpreters were present during
hearings.  Ultimately, the Immigration Judge's written order of
December 11, 2012, determined "that Respondents are each
removable for having been convicted of a crime involving moral
turpitude."  ECF No. 76-1, PageID # 431.  The Immigration Judge
ruled that Petitioners failed to establish statutory eligibility
for cancellation of removal, stating, "Respondent's are removable
on the lodged charge and the applications for *Cancellation of
Removal and Adjustment of Status for Certain Nonpermanent
Residents* are pretermited and denied."  *Id.*, PageID # 432.

        11.  While the record does not reflect that the
December 2012 written order was read to Petitioners, the

conclusion was communicated to them at a hearing on January 8, 2013, which was interpreted into Spanish.  *See* Ex. 23, Bates Stamp No. 00125.  The Immigration Judge expressly stated, "So I'm going to have to enter orders of removal to Mexico."  *Id.*, Bates Stamp No. 00126.  Avendano-Silva consistently testified that he knew at this time that the Immigration Judge had ruled against him and that he would be removed to Mexico.  *See* Avendano-Silva Test., ECF No. 94, PageID # 614.

    12.  This court understands that the Immigration Judge's written orders may have been incomprehensible to Petitioners because the orders were in English.  This court takes into account the possibility that any order not read out loud in immigration proceedings might not have been translated for Petitioners.  This court also realizes that the concept of CIMTs may have remained unclear to them.  But they had to have known by at least January 2013 that the Immigration Judge saw no way to avoid their deportation in light of their convictions.

    13.  Moreover, if Petitioners ever received official documents in English that they needed to have explained to them in Spanish, they knew they needed translations.  This court has difficulty understanding why they did not seek explanations of English-language orders from Singh or anyone else.

    14.  On February 25, 2015, the BIA dismissed Petitioners' appeal of the Immigration Judge's order.  *See* ECF

No. 76-3, PageID # 439.  The BIA determined that they were
"removable as charged and ineligible for cancellation of removal"
because they had been convicted of "categorical crime[s]
involving moral turpitude," making them "inadmissible" and
"ineligible for cancellation of removal."  *Id.*  Villanueva-
Martinez certainly knew of the immigration consequences by the
time the BIA issued its ruling, as she says that she was
"paralyzed by the thought that [her] children would be left alone
in the United States" once the BIA "said that we had to depart
the country within 30 days."  *See* Villanueva-Martinez Decl., ECF
No. 61-4, PageID # 339.  Avendano-Silva says he knew the BIA's
decision was not good.  *See* Avendano-Silva Decl., ECF No. 61-3,
PageID #s 324-25 (saying that he did not understand exactly what
the BIA decision was because it was in English, but he
"understood enough to know the outcome was not good").

    15.  The Ninth Circuit noted that the Immigration Judge
and the BIA had both determined that Petitioners' convictions for
passport fraud were CIMTs that made them ineligible for
cancellation of removal.  *See* ECF No, 76-4, PageID # 443.  The
Ninth Circuit agreed that Petitioners were "barred from seeking
cancellation of removal because they have been convicted of a
crime of moral turpitude."  *Id.*, PageID # 444.  Even if
Petitioners could not read or understand the Ninth Circuit's
decision, they knew that the Ninth Circuit had ruled against

them, as they were "distraught and fearful that ICE would show up at our home to deport us" after the Ninth Circuit ruled in June 2019. *See* Villanueva-Martinez Decl., ECF No. 61-4, PageID # 339.

16.  Petitioners and Singh appear to agree that Singh discussed the possibility of applying for immigrant visas when their eldest child turned 21, about having one of their children join the military to improve Petitioners' chances of being allowed to stay in the United States, and about seeking presidential pardons. *See* Avendano-Silva Decl., ECF No. 61-3, PageID # 325; Avendano-Villanueva Test., ECF No. 95, PageID # 681.  Petitioners' coram nobis counsel says that none of those possibilities was viable.

17.  Even if Singh was mistaken in raising those possibilities, Petitioners do not explain why they waited nearly five years from the date of the Ninth Circuit's ultimate decision on June 17, 2019, to file this motion on March 21, 2024.  They knew in 2019 that the appeal process was over.  When Singh raised possible avenues of action, Petitioners' eldest child was not yet 21.  She is now 26.  And even if they could justify some delay (e.g., continuing to follow Singh's advice after the Ninth Circuit decision), they do not sufficiently explain why they delayed more than a year after talking with their new counsel in January 2023, when they say they finally realized what the immigration consequences of their guilty pleas were.

18. Petitioners' argument that Singh misled them with respect to the immigration consequences and that they had no reason to know of any basis for seeking coram nobis relief until January 2023 is unpersuasive. *See* Villanueva-Martinez Decl., ECF No. 61-4, PageID # 341 (saying that she "learned" then that her § 1641 conviction was a CIMT that made her ineligible for cancellation of removal); Avendano-Silva Decl., ECF No. 61-3, PageID # 327 (saying that, on January 27, 2023, they consulted with Marc Van Der Hout and Johnny Sinodis, immigration attorneys, who told them that their § 1592 convictions were CIMTs that made them ineligible for cancellation of removal); Sinodis Decl., ECF No. 61-2, PageID # 307 (stating that Petitioners first consulted with his office on January 27, 2023); *see also* ECF No. ECF No. 98, PageID # 799-800 (arguing that Singh's misadvice justified the delay).

19. When the Ninth Circuit decided their immigration appeal in 2019, Petitioners knew that the outlook was not good. They had to know by then that they were in serious trouble. Singh explained, "Although I provided them different options we could *try* to pursue, I was always up front about the likelihood of success, which in their case was quite slim." ECF No. 76-5, PageID # 453.

20. Moreover, as this court noted earlier, Petitioners have not been credible in many respects. This court is not

persuaded that they first realized what the immigration consequences of their convictions were in January 2023.  If that were true, they should have acted within a reasonable time upon being struck by this alleged thunderbolt.  Their Reply states that time was needed to confer with new counsel, gather records, conduct legal research, and draft this motion and accompanying declaration.  *See* ECF No. 79, PageID # 481.  Those reasons do not justify a lapse of 14 months between January 2023 and the filing of this motion.  *See Kroytor*, 977 F.3d at 963 n.3 (noting that the need to gather declarations was not a valid justification for a 10-month delay).  Having failed to sufficiently explain the delay in filing their coram nobis motion, they are not entitled to coram nobis relief.

21.   The coram nobis motion is additionally denied based on laches.  The Ninth Circuit has noted that there is no specific time limitation for filing a coram nobis motion.  *See Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994).  Instead, the Ninth Circuit says that a coram nobis motion "is subject to the equitable doctrine of laches," which "bars a claim if unreasonable delay causes prejudice to the defendant.  *Id.*

22.   Under the coram nobis framework, the burden of proof is normally on the defendant to offer valid reasons for the delay in filing a coram nobis motion.  However, when the Government asserts that a coram nobis motion is barred by laches,

46

that framework changes.  Instead, "the government first must make a prima facie showing of prejudice. . . .  If the government meets that burden, the burden of production of evidence then shifts to the petitioners to show either that the government actually was not prejudiced or that the petitioner exercised reasonable diligence in filing the claim." *Riedl*, 496 F.3d at 1008.

23.  The Government has met its initial burden of demonstrating prejudice flowing from Petitioners' delay in filing the coram nobis motion, as evidence supporting its arguments is no longer available.  For example, Saibene might have been able to testify about whether and how many times he translated for Petitioners and what was told to them.  Unfortunately, however, he passed away in 2018.  *See* Ex. 26 (Certification of Death). Because Hawaii does not require attorneys to maintain client files for a dozen years, Singh has no client files that would assist in establishing what occurred.  *See* Singh Test., ECF No. 95, PageID # 688.  His client files might have also contained any documents relevant to the present coram nobis motion.  Finally, FDC Honolulu no longer has visitor logs showing whether and when any meeting occurred involving Avendano-Silva, Singh, and Saibene because logs are not kept for more than 10 years.  *See* ECF No. 76, PageID # 424.  These logs could have corroborated Singh's

testimony that he met with Avendano-Silva with an interpreter present.

24.  The court is not persuaded that the unavailable evidence should not be considered in determining the laches argument.  *See* ECF No. 98, PageID # 800 (claiming that the delay did not cause any prejudice arising from the unavailable evidence).  The evidence is unavailable to assist the court in determining certain material matters that the Government might have urged the court to find.

25.  The Government additionally says it would suffer prejudice if the convictions are vacated because applicable statutes of limitation would bar recharging Petitioners.  *See* ECF No. 76, PageID # 425.  It says that certain evidence supporting such charges, such as the passport applications, written admissions, and evidence related to uncharged conduct cannot be found, and that witnesses are likely to be missing or may not remember details.  *See* ECF No. 97, PageID # 787.  This court does not consider this particular alleged prejudice.  In the normal case, coram nobis relief "comes after the petitioner has completed his sentence," meaning that "the petitioner will not be retried."  "[T]hus, the granting of coram nobis normally results in the expungement of the conviction, with no possibility of further proceedings to determine whether the petitioner was guilty of the offense charged."  *United States v. Mandanici*, 205

F.3d 519, 532 (2d Cir. 2000) (Kearse, J., concurring); *United States v. Wilson*, 2020 WL 3051250, at *2 (S.D. Miss. June 8, 2020) (same); *United States v. Verrusio*, 2017 WL 2634638, at *6 (D.D.C. June 19, 2017) (same), aff'd, 758 F. App'x 2 (D.C. Cir. 2019).  The Government does not provide any reason for some different approach here.  Accordingly, while the court does conclude that laches applies here, that conclusion does not rest on any alleged prejudice with respect to a bar on bringing new charges.

### Petitioners Fail to Satisfy Their Burden of Showing that the Supposed Error is of the Most Fundamental Character.

26.  While Petitioners' failure to provide valid reasons for the delay in attacking their convictions is, on its own, sufficient reason to deny coram nobis relief, this court looks also at whether Petitioners meet their burden of satisfying the fourth coram nobis requirement of demonstrating a fundamental error.  *See Shin v. United States*, 2023 WL 2523613, at *1 n.1 (9th Cir. Mar. 15, 2023).  Ineffective assistance of counsel can satisfy this fourth coram nobis requirement.  *See United States v. Kwan*, 407 F.3d 1005, 1014 (9th Cir. 2005), abrogated on other grounds by *Padilla v. Kentucky*, 559 U.S. 356 (2010); *see also Aghamalian v. United States*, 781 F. App'x 576, 578 (9th Cir. 2019).

27.   To establish ineffective assistance of counsel, Petitioners must establish: 1) that their counsel's performance fell below an objective standard of reasonableness, and 2) that the deficiency in their counsel's performance prejudiced them. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   There is "a strong presumption" that counsel's conduct was reasonable and that counsel's representation did not fall below "an objective standard of reasonableness" under "prevailing professional norms."  *Id.* at 688.  Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction," judicial scrutiny of counsel's performance is highly deferential.  *Id.* at 689.

28.   In 2010, the Supreme Court held that, to be constitutionally effective, counsel "must inform her client whether his plea carries a risk of deportation."  *Padilla*, 559 U.S. at 374.  The following year, in *United States v. Bonilla*, 637 F.3d 980, 984 (9th Cir. 2011), the Ninth Circuit explained that a "criminal defendant who faces almost certain deportation is entitled to know more than that it is possible that a guilty plea could lead to removal; he is entitled to know that it is a virtual certainty."

29.   Whether Singh's performance fell below an objective standard of reasonableness turns on what he told Petitioners with respect to the immigration consequences of their

guilty pleas.  Petitioners are not credible in contending that, when they pled guilty, Singh was ineffective in failing to explain that their removal was a virtual certainty.  Petitioners lack of truthfulness to the court in various ways casts serious doubt on their claim that Singh failed to sufficiently inform them of the dire immigration consequences they faced.

30.  First, Singh must have spoken to them about their immigration status, notwithstanding their claim to the contrary. The Indictment in this case, Avendano-Silva's detention proceeding, and the turning over of Petitioners' Mexican passports made it abundantly clear that Petitioners were citizens of Mexico not legally in the United States.  Their need for a Spanish translator would have also caused Singh to inquire about their immigration status, which he did in his initial intake questionnaire.  Villanueva-Martinez even admitted during her testimony that she told Singh that she was not legally in the country.

31.  Second, this court questions Petitioners' truthfulness in saying that they had interpretation services for only in-court proceedings.  It is simply not credible that Singh would have met with Avendano-Silva more than once without an interpreter if Avendano-Silva made it clear that language was a barrier.  Avendano-Silva did speak some English, and Villanueva-Martinez spoke more English than her husband did.  But assuming

both had insufficient English to understand English-language explanations of immigration consequences, Singh had no reason to struggle without an interpreter.  Singh credibly testified that he needed and used an interpreter to communicate with Petitioners.

32.   Third, Petitioners are not credible in saying that no interpreter helped to explain their plea agreements.  Singh credibly testified that an interpreter translated the plea agreements for them.  Moreover, under oath, Petioners told the Magistrate Judge at their change of plea hearing that the plea agreements had been translated and explained to them in Spanish and that they understood the agreements.  They contend that they lied in that hearing but are telling the truth now.  This position raises huge red flags for this court.

33.   Fourth, Villanueva-Martinez now disavows the allocution letter she submitted for consideration in sentencing. She says that the letter was written for her and that it was incorrect in expressing willingness to move to Mexico.

34.   Singh credibly says that he told Petitioners that it was "virtually certain" that they would be removed because their crimes were CIMTs and because they entered the United States without inspection.  While Singh may have told them that "it was not clear" that their convictions were CIMTs, that was a reference to his good-faith argument that, under the

circumstances of their case, Petitioners could not be said to have committed crimes that qualified as CIMTs.  This court understands that Petitioners are arguing that Singh was incorrect in positing that there was any chance of avoiding deportation. But this court cannot ignore the way the Ninth Circuit handled Singh's argument on behalf of Petitioners.  The motions panel declined to summarily reject Singh's argument, and the merits panel rejected it only after noting that the development of the categorical approach had to be taken into account before applying *Bissaillon*'s holding.

35.  Singh says he told Petitioners that he could not think of any relief they could get from the immigration court, and he "made it clear, it's a matter of time when you guys are going to get deported."  Singh Test., ECF No. 95, PageID # 703. They could delay deportation, but it would happen.

36.  In Petitioners post-hearing Reply brief, they argue that Singh "never said he considered that removing both parents of three minor U.S. citizen children, effectively rendering them orphans, could warrant cancellation of removal." *See* ECF No. 98, PageID # 795.  But this was not an argument raised in Petitioners' motion such that the Government was on notice to develop the record with respect to it.  Moreover, Petitioners fail to show when Singh was even asked whether he considered that argument.

37.   Even if a defendant overcomes the presumption of effectiveness, the defendant must still demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   A different result need not be success on the merits.   The Ninth Circuit considered a coram nobis motion involving a claim of deficient counsel performance arising out of counsel's alleged failure to inform the defendant about the immigration consequences of a guilty plea.   The defendant argued that she suffered prejudice in the form of pleading guilty instead of going to trial.   The Ninth Circuit stated that, under those circumstances, the defendant "can show prejudice by demonstrating a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial." *United States v. Chan*, 732 F. App'x 501, 503 (9th Cir. 2018) (unpublished disposition)  (quotation marks and citation omitted).   The Ninth Circuit has explained that, when ineffective assistance causes a defendant to accept a plea bargain, a different result means that the defendant would have gone to trial or received a better plea bargain. *United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015).

38.   Petitioners assert that, had they been properly informed of immigration consequences, they would have insisted on "immigration safe" pleas or would have gone to trial.   Under

*Rodriguez-Vega*, 797 F.3d at 788, one way Petitioners can demonstrate a reasonable probability that they would have negotiated a better plea deal is by identifying other cases in which the Government permitted individuals charged with the same or similar crimes to plead guilty to nonremovable or "immigration safe" offenses.  Petitioners identify no such cases.

39.  Singh, on the other hand, credibly says that AUSA Hino would not have offered "immigration safe" pleas.  Singh also casts doubt on the credibility of Petitioners' claim that they would have gone to trial.  He says they were focused on spending as little time as possible in custody and on staying in the country at least until their oldest daughter had graduated from high school.  Villanueva-Martinez allegedly told Singh she would move to Mexico and also submitted the allocution letter previously referred to in this order.  This court has already expressed concern about what Villanueva-Martinez has been willing to sign.

**The Conflict of Issue Argument Was Not Timely Raised.**

40.  The coram nobis motion did not argue that Singh had an actual conflict of interest affecting his representation. *See* ECF No. 61.  However, citing Singh's live testimony, Petitioners' post-hearing brief makes that argument, noting that Singh testified that Villanueva-Martinez told him that she would do whatever her husband wanted.  *See* ECF No. 96, PageID # 775.

55

Petitioners say this presented the potential for a conflict that Singh did not advise the clients about.  They hypothesize a conflict if Avendano-Silva had sought a plea agreement that favored himself over his wife.  Of course, that is not what happened.  Petitioners agreed with the factual bases of the charges and with the course of action taken.

41.  The court disregards this actual conflict argument because the Government had insufficient notice of it such that it could develop a sufficient record on the matter during the evidentiary hearing.  The argument was initially raised in a post-hearing brief filed well after the reply brief.  *See* Local Rule 7.2 (stating that any argument raised for the first time in a reply brief shall be disregarded).

42.  The conflict argument fails in any event because Petitioners show no prejudice in that regard.  The hypothetical conflict arose when Singh allegedly allowed Avendano-Silva to do what was in his best interest while Villanueva-Martinez went along with what her husband wanted to do.  There is no evidence that this actually affected Singh's representation or prejudiced them such that Singh's representation could be said to have been ineffective.  At most, Petitioners posit that Singh might have asked the Government to let one Petitioner plead to a crime that was not a CIMT.  But Singh testified that AUSA Hino did not offer immigration-safe pleas, and Petitioners have identified no other

56

case in which the Government offered an immigration-safe plea under similar circumstances.

43.  Singh's testimony during the coram nobis proceedings about facts underlying the alleged conflict does not justify Petitioner's delay in raising the conflict issue. Petitioners knew what they had told Singh and therefore had the facts to reasonably assert any conflict claim much earlier. *See Kroytor*, 977 F.3d 961-63.

**V.      CONCLUSION.**

While recognizing the pain Petitioners and their children will suffer, this court concludes that the factual record and applicable law require denial of the coram nobis motion.  The Clerk of Court is directed to file a copy of this order in both the criminal and civil cases, Criminal No. 11-00763 SOM and Civil No. 24-00137 SOM/RT, and to enter judgment in the civil case in favor of the Government.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 25, 2024.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*Avendano-Silva v. United States*, CRIM. NO. 11cr763 SOM; CIV. NO. 24-00137 SOM/RT ORDER
DENYING MOTION FOR CORAM NOBIS RELIEF